FILED by DG   D.C.

**Dec 27, 2016**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. –MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

## 16-20971-CR-WILLIAMS/SIMONTON

Case No. _____

**18 U.S.C. § 371**

**UNITED STATES OF AMERICA**

**v.**

**LUIS SANTIAGO,**

             **Defendant.**

_____/

## INFORMATION

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

1.       The City of Opa Locka ("Opa Locka") was an incorporated municipality located within the State of Florida and the Southern District of Florida, which was a unit of, and subject to, the laws of Florida.   Opa Locka had a "commission-manager" form of municipal government, with a five-member elected City Commission consisting of a Mayor and four Commissioners elected from the City at large, who collectively were responsible for enacting ordinances, resolutions and regulations governing the city.

2.       In addition, Opa Locka had a City Manager appointed by the City Commission to serve as the city's chief administrative officer.   The City Manager was responsible for directing and coordinating the administration of the city in accordance with

policies determined by the City Commission, the City's Charter and Code of Ordinances, and all applicable federal, state, and local laws.   Opa Locka also had an Assistant City Manager who reported directly to the City Manager and who was responsible for assisting the City Manager in the administration of the city's governmental functions, including the oversight of the day-to-day operations of city government.

3.     Opa Locka's city government consisted of numerous departments carrying out the city's functions, including Building and Licenses, Code Enforcement, Public Works, Finance, Information Technology, Purchasing, and the City of Opa Locka Police Department.   These departments each ultimately reported to the City Manager.

4.     The Building and Licenses Department was responsible for issuing occupational licenses, building, electrical, mechanical, roofing, and plumbing permits, and certificates of occupancy.   Its functions also included: providing inspections to ensure compliance with the occupational license ordinance; enforcing compliance with Opa Locka city codes, State of Florida building and zoning codes, and county land development regulations; and, reviewing building plans and land development applications to ensure consistency with the Opa Locka Comprehensive Plan.

5.     Code Enforcement was responsible for upholding and enforcing the codes and standards established by the City of Opa Locka to protect the public health, safety, and welfare of all residents and visitors in the city.   The codes and standards maintained and enforced by Code Enforcement included city codes, fire codes, uniform building codes, uniform housing codes, and zoning ordinances.

6.     The Public Works Department was responsible, among other areas, for

2

providing and maintaining the public works infrastructure for the City of Opa Locka, including the City's water and sewer service.   As part of these responsibilities, the Public Works Department handled the initiation, maintenance, and shutdown of water and sewer service to businesses and individuals located in Opa Locka.

7.     Opa Locka was a local government that received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance during each of the following one-year periods: calendar year 2014; calendar year 2015; and calendar year 2016.

8.     At all times relevant to this Information, defendant **LUIS SANTIAGO** ("**SANTIAGO**") was an Opa Locka City Commissioner.   While **SANTIAGO** was one of the elected officials collectively responsible for enacting ordinances, resolutions and regulations governing the city, his regular duties and responsibilities did not include involvement in overseeing the day-to-day operations of Building and Licenses, Public Works, or Code Enforcement.

9.     At various times relevant to this Information, David Chiverton ("Chiverton") was Assistant City Manager of Opa Locka, then was named Interim City Manager in November 2015, and was formally named City Manager by the City Commission in March 2016.   Chiverton's regular duties and responsibilities included involvement in overseeing the day-to-day operations of Building and Licenses, Public Works, and Code Enforcement.

10.     At various times relevant to this Information, Gregory Harris ("Harris") was Operations Manager and then an Assistant Director of the Public Works Department.   As

Operations Manager, and later as Assistant Director, Harris' duties included directing and overseeing the initiation and maintenance of water service to businesses and individuals in Opa Locka, and directing and overseeing the shutdown of water service for reasons including non-payment of the water fees due to Opa Locka.

11.     An individual referred to herein as Confidential Human Source 1 ("CHS 1") operated a storage and used vehicle business in Opa Locka, which obtained vehicles from sources inside and out of Florida for resale, and used the internet to promote its sales efforts.  CHS 1 was attempting to obtain an Opa Locka occupational license beginning in 2014.

12.     An individual referred to herein as Confidential Human Source 5 ("CHS 5") operated an auto body repair shop in Opa Locka which obtained parts from out-of-state suppliers and submitted insurance claims to companies located outside of Florida.   CHS 5 was attempting to obtain an Opa Locka occupational license beginning in 2015.

13.     An individual referred to herein as Confidential Human Source 9 ("CHS 9") operated a recycling business which purchased equipment manufactured outside of Florida, collected items manufactured outside of Florida and processed them for recycling, and re-sold the resulting recycled materials. In late 2015, CHS 9 sought to purchase a property located in Opa Locka and was attempting to obtain a new occupational license in connection with that property.

14.     An individual referred to herein as Business Owner 1 ("Owner 1") operated an auto repair business in Opa Locka, which obtained and used parts which were manufactured outside of Florida.   Owner 1 was attempting to obtain an Opa Locka

occupational license in 2015.

15.     An individual referred to herein as Business Owner 2 ("Owner 2") operated a retail business in Opa Locka, which obtained and resold products manufactured outside of Florida.

## COUNT 1

1.     The General Allegations section of this Information is realleged and expressly incorporated herein as if set forth in full.

2.     From in or around March 2014 and continuing through on or about March 10, 2016, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**LUIS SANTIAGO,**

did knowingly and willfully combine, conspire, confederate, and agree with David Chiverton, Gregory Harris, and other persons known and unknown to the United States Attorney, to commit an offense against the United States, that is: (a) to commit Federal program bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B); and (b) to commit extortion under color of official right, in violation of Title 18, United States Code, Section 1951(a).

### OBJECT OF THE CONSPIRACY

3.     It was a purpose and object of the conspiracy for **LUIS SANTIAGO,** David Chiverton, Gregory Harris, and their co-conspirators to unlawfully enrich themselves by using the official positions and authority that **SANTIAGO**, Chiverton, and Harris had with the City of Opa Locka to solicit, demand, and obtain payments and other things of value

from businesses and individuals in exchange for taking official actions, and for directing, pressuring, advising, and requesting other city employees to take official actions, to assist and benefit those businesses and individuals in their dealings with the City of Opa Locka.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspiracy was accomplished included, among other things, the following:

4.    **LUIS SANTIAGO**, both individually and in conjunction with other co-conspirators, would directly and indirectly solicit and obtain illegal payments from businesses and individuals in Opa Locka, including CHS 1, CHS 5, CHS 9, Owner 1, and Owner 2, in exchange for **SANTIAGO** using his official position to assist those businesses and individuals in dealings with the City of Opa Locka, including occupational licensing, code enforcement and liens, water service and billing, and zoning issues.

5.    In exchange for these illegal payments, **LUIS SANTIAGO** would take official actions, and would direct, pressure, advise, and request that Chiverton, Harris, and other City of Opa Locka employees take official actions on behalf of the paying businesses and individuals, including, but not limited to: issuing occupational licenses; waiving, removing, and settling code enforcement matters and liens; initiating, restoring and continuing water service; and assisting with zoning issues.   **SANTIAGO** would make payments to Chiverton, and **SANTIAGO** also would direct the paying businesses and individuals to make payments to Chiverton in exchange for the official actions taken on their behalf.

6.    Chiverton, both individually and in conjunction with **SANTIAGO** and other co-conspirators, also solicited and obtained personal payments from businesses and

individuals in Opa Locka, in exchange for Chiverton taking official actions, and directing, pressuring, advising, and requesting other City of Opa Locka employees to take official actions, to assist those paying businesses and individuals in their dealings with the city, including, but not limited to: occupational licensing; code enforcement and liens; water service and billing; and zoning issues.   Chiverton also would direct and request that Harris and other City of Opa Locka employees take official actions on behalf of the paying businesses and individuals.

### Overt Acts

In furtherance of the conspiracy and to achieve the objective thereof, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

A.      On or about July 25, 2014, **LUIS SANTIAGO** met with CHS 1 and discussed CHS 1's occupational license while driving around Opa Locka in **SANTIAGO's** vehicle, and **SANTIAGO** accepted $500 in cash from CHS 1 during the meeting.

B.      On or about November 25, 2014, during a meeting at CHS 1's business, **LUIS SANTIAGO** accepted $200 in cash from CHS 1 and told CHS 1 to meet with David Chiverton the next day.

C.      On or about November 26, 2014, David Chiverton met in his office at Opa Locka City Hall with CHS 1 and told CHS 1 that he was changing the zoning for CHS 1's property.

D.      On or about January 9, 2015, **LUIS SANTIAGO**, David Chiverton, and CHS 1 met in Chiverton's office regarding CHS 1's occupational license.   During this meeting,

**SANTIAGO** told CHS 1 to give Chiverton "a prize" for taking care of CHS 1, and told Chiverton to give CHS 1 the easiest occupational license to obtain.

      E.     On or about January 12, 2015, **LUIS SANTIAGO** met with CHS 1 in **SANTIAGO's** office at Opa Locka City Hall and discussed David Chiverton giving CHS 1 an occupational license even though CHS 1 had an outstanding lien on the business property.   Chiverton joined this meeting, and then took CHS 1 to his office where they discussed the occupational license and Chiverton accepted a $500 cash payment from CHS 1, who promised "five more chocolates today if you finish."

      F.     Later that afternoon, David Chiverton met in his office with CHS 1 and accepted an additional $500 in cash.   After this second meeting with Chiverton, CHS 1 met with **LUIS SANTIAGO** and they walked out of City Hall into the parking lot, where **SANTIAGO** accepted $500 in cash from CHS 1 at the passenger's door of CHS 1's car.

      G     On the morning of on or about January 14, 2015, David Chiverton met at his office with CHS 1 and gave him his occupational license.   Chiverton also told CHS 1 the names of a number of Opa Locka officials who Chiverton claimed he had to pay in connection with issuing the license, and asked CHS 1 if he could bring him $2500 for this purpose.

      H.     Later that day, David Chiverton again met in his office with CHS 1, and after CHS 1 explained that he brought $1000 for him, Chiverton agreed to give CHS 1 until the next week to pay the rest of the promised money.   Chiverton accepted $1000 in cash from CHS 1 and agreed to take care of three fines and $63,000 in liens on CHS 1's property.

I.      On or about January 23, 2015, David Chiverton accepted $1000 in cash from CHS 1 in the parking lot of Opa Locka City Hall.

J.      On or about March 3, 2015, David Chiverton met at his office with CHS 1 and agreed to resolve the fines imposed against CHS 1's business in exchange for a payment from CHS 1.   Chiverton accepted $1200 cash at the meeting and asked when CHS 1 would be paying the additional $800 Chiverton wanted for taking this official action on behalf of CHS 1.

K.      On or about March 24, 2015, during a meeting at a restaurant in Opa Locka, **LUIS SANTIAGO** turned over CHS 5's occupational license and requested more money from CHS 5 to finalize their deal for the license.

L.      On or about March 26, 2015, **LUIS SANTIAGO** drove to CHS 5's business and accepted an additional $500 from CHS 5 for the occupational license previously provided.

M.      On or about April 9, 2015, **LUIS SANTIAGO** participated in a telephone conversation with CHS 5 during which CHS 5 told **SANTIAGO** that Opa Locka was going to shut off the water at CHS 5's business due to unpaid water bills.

N.      On or about April 10, 2015, during a telephone conversation, **LUIS SANTIAGO** told CHS 5 to meet him outside **SANTIAGO's** house to resolve CHS 5's water bill in order to avoid a shutdown of water service to CHS 5's business.   Later that evening, **SANTIAGO** met CHS 5 outside **SANTIAGO's** house and accepted $850 in cash from CHS 5 in exchange for resolving the water bill and preventing the shutdown of water service at CHS 5's business.

9

O.      On or about April 14, 2015, during a telephone conversation, **LUIS SANTIAGO** asked Gregory Harris to go to CHS 5's business to stop an Opa Locka employee from shutting down water service at CHS 5's business, and **SANTIAGO** also instructed Harris not to talk to anyone about this request.

P.      In or around April 2015, **LUIS SANTIAGO** met with Owner 1 and offered to quickly get Owner 1 his occupational license in exchange for a personal payment. Owner 1 agreed to **SANTIAGO's** demand, and paid **SANTIAGO** approximately $1000 in cash.   **SANTIAGO** then directed Opa Locka employees to issue the occupational license for Owner 1's business, and **SANTIAGO** demanded an additional $500 from Owner 1, which was paid when **SANTIAGO** delivered the license.

Q.      In or around April 2015, after a portion of Owner 2's business was shut down by Code Enforcement, **LUIS SANTIAGO** met with Owner 2 and told him that he had an associate who could help Owner 2 obtain the permit needed to reopen in exchange for a payment from Owner 2.

R.      In or around late April 2015, Owner 2 contacted **LUIS SANTIAGO** after a different portion of his business received a code enforcement violation notice, and **SANTIAGO** once again told Owner 2 that **SANTIAGO's** associate could resolve the matter.

S.      On or about December 16, 2015, during a meeting at CHS 9's business, **LUIS SANTIAGO** requested a $2500 payment from CHS 9 in exchange for a new occupational license for the business.   **SANTIAGO** ultimately agreed to accept $2000, with $1000 to be paid up front, and as the meeting continued, **SANTIAGO** accepted

10

$1000 in cash from CHS 9.

T.     On or about January 13, 2016, **LUIS SANTIAGO** provided CHS 9 with a certificate of use and a storage license issued in the name of the previous business, and in exchange for these licenses, **SANTIAGO** accepted an additional $1000 in cash from CHS 9.

U.     On or about February 3, 2016, **LUIS SANTIAGO** met at Opa Locka City Hall with CHS 9 and David Chiverton regarding a new license for CHS 9's business, and **SANTIAGO** told CHS 9 that Chiverton was going to take care of the licensing and zoning for CHS 9's new business.   **SANTIAGO** told CHS 9 that on his own, the process would cost approximately $75,000, but by going through Chiverton, CHS 9 would only need to pay $10,000 to resolve the licensing and zoning issues.  As this meeting concluded, **SANTIAGO** and CHS 9 went into the hallway and **SANTIAGO** instructed CHS 9 to pay Chiverton $2500 to start the process.

V.     On or about February 4, 2016, David Chiverton and CHS 9 met in a hallway at Opa Locka City Hall and CHS 9 told Chiverton that he had what **LUIS SANTIAGO** told him to bring.   Chiverton then led CHS 9 into the foyer of a bathroom where Chiverton accepted a $2500 cash payment and told CHS 9 that he would get CHS 9 what he needed.

W.     After leaving the bathroom, CHS 9 encountered **LUIS SANTIAGO** in the hallway, and **SANTIAGO** asked if CHS 9 had received his new business license.   CHS 9 told **SANTIAGO** that he (CHS 9) had forgotten to tell David Chiverton that when Chiverton needed more money, that he needed time to get it from his partner.

**SANTIAGO** told CHS 9 to let Chiverton work on things for the time being.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE

1.     The allegations contained in this Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **LUIS SANTIAGO**, has an interest.

2.     Upon conviction of a conspiracy to violate Title 18, United States Code, Sections 666(a)(1)(B) and 1951(a), all in violation of Title 18, United States Code, Section 371, as alleged in this Information, the defendant, **LUIS SANTIAGO,** shall forfeit to the United States any property, real or personal, which constitutes proceeds traceable to said violation pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and the procedures outlined at Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c).

WIFREDO A. FERRER
UNITED STATES ATTORNEY

EDWARD N. STAMM
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

LUIS SANTIAGO,

                                    Defendant.
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

Superseding Case Information:

**Court Division**: (Select One)

| | | | |
|---|---|---|---|
| **X** | Miami | ____ | Key West |
| ____ | FTL | ____ | WPB | ____ | FTP |

New Defendant(s)          Yes _____ No _____
Number of New Defendants  _____
Total number of counts    _____

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:     (Yes or No)      No
     List language and/or dialect     _____

4.   This case will take      0      days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                          (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | **X** | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | **X** |
| V | 61 days and over | _____ | | |

6.   Has this case been previously filed in this District Court?   (Yes or No)   No
If yes:
Judge: _____   Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?   (Yes or No)   No
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)      No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____Yes    X   No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____Yes    X   No

_____
EDWARD N. STAMM
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 373826

*Penalty Sheet(s) attached                                              REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: <u>LUIS SANTIAGO</u>
Count #: 1

Conspiracy to Commit an Offense against the United States

Title 18, United States Code, Section 371

**\* Max.Penalty**:        5 years imprisonment

Counts #:

**\* Max.Penalty**:

Count #:

**\* Max.Penalty**:

Count #:

**\* Max.Penalty**:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| LUIS SANTIAGO, | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*